UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-81103-CIV-MATTHEWMAN

Denise Clay,

     Plaintiff,

vs.

Commissioner of Social Security,

     Defendant.

_____/

FILED BY _____KJZ_____ D.C.

*Mar 30, 2021*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 25, 32]</u>

**THIS CAUSE** is before the Court upon Plaintiff, Denise Clay's ("Plaintiff") Motion for Summary Judgment and Memorandum [DE 25], and Defendant, Andrew Saul, Acting Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law [DE 32]. The issues before the Court are whether the record contains substantial evidence to support the denial of benefits to Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I.    <u>FACTS</u>

On May 25, 2016, Plaintiff applied for a period of disability, disability insurance benefits, and Supplemental Security Income (SSI) alleging disability beginning March 31, 2015. [R. 90-91, 213-28].[1] Defendant denied Plaintiff's applications initially and on reconsideration. [R. 70-127,

_____

[1] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 16.

1

131-42]. Plaintiff requested a hearing before an ALJ. [R. 143-44]. Following the hearing, the transcript of which is found at [R. 35-69], the ALJ, Paul Armstrong, issued an unfavorable decision on August 31, 2018. [R. 17-28]. On May 30, 2019, the Appeals Council denied Plaintiff's request for review. [R. 1-4, 210-12]. Plaintiff now seeks review by this Court. [R. 1].

A.   Hearing Testimony

Plaintiff was first questioned by the ALJ. The ALJ began by discussing Plaintiff's prior job as a letter carrier with the U.S.P.S. and an accident that she had while driving a mail truck. [R. 39-41]. Plaintiff told the ALJ that the accident did not cause the disability for which she was seeking benefits; instead, she informed him that her claim was based on stress and mental health issues. [R. 40]. The ALJ then questioned Plaintiff regarding her home life at that time, which involved living with her daughter:

> Q.   It looks like you went from the frying pan to the fire. You moved onto Palm Beach and then it looks like every relative with every kid in sight moved in with you. Like you're taking care of 20 kids or something, relatives or something and you needed to get some peace and quiet or something. That's what it said when you moved over at Jerome Golden. They were expecting you to take care of like five or six kids, right, at that time?
>
> A.   No, Sir. I wasn't expected to take care of five or six kids. I was living with my daughter. I am to this day.

[R. 41-42]. The ALJ asked Plaintiff about her current source of income, specifically asking if she had "some kind of disability pension from the government," which Plaintiff did not. [R. 42]. Plaintiff then informed the ALJ that she pulled out all of her retirement funds due to the issues with stress that she was experiencing at the time, to which the ALJ responded "yeah, you pulled them out at the wrong time . . . . You know, they were all down . . . and now you got nothing?" [R. 42-43]. The ALJ asked Plaintiff if there were any retirement options left for her at the U.S.P.S.,

because "it might be more lucrative" than SSI. [R. 42]. When told by Plaintiff that such an outcome was unlikely, the ALJ opined that Plaintiff could work for "you know, FedEx, UPS, Amazon, Uber, you know what I mean? You still got your driver's - - you got a chauffer's license or not?" *Id.* Plaintiff stated that she did not have a driver's license. *Id.*

The ALJ next reviewed "the stuff from Golden,"[2] concluding that "it looks like you did very well when you were in there . . . . That's the nice thing about it and so you know, and they said you looked fine. You were very - - you're a very nice lady." [R. 44.] The ALJ then questioned whether her children were employed, which she answered in the affirmative. *Id.*

The ALJ then asked Plaintiff if she was "healthy or do you have something wrong with you physically?" [R. 45]. Plaintiff stated that she was physically healthy, but that she could not remember anything. *Id.* The ALJ asked if she was under the care of a "psychologist or counselor," to which she stated that she was. *Id.* The ALJ then returned to the subject of Plaintiff's home life, and asked what she was expected to do around the house. *Id.* Plaintiff testified that some days she has a "bad, bad state of mind," cannot get out of bed on dark days, and has trouble explaining how bad those days are. *Id.* The ALJ asked "if they [gave] you some techniques for getting out of that," to which Plaintiff responded that she was taking medication and exercised. *Id.* The ALJ told Plaintiff to "start with that, a lot of times you're in Florida, so you got decent weather. You can do that. Are you near the ocean at all?" [R. 45-46]. The ALJ made suggestions to Plaintiff as to how she could overcome her mental issues, including "there's a soothing thing about walking and getting out [] and then maybe it's the breathing, did they talk to you about breathing exercise, slow down your breath?" *Id.* The ALJ suggested that Plaintiff read a book called *The Healing Power*

---

[2] The Court presumes this refers to Jerome Golden Medical Center.

*To Breath* and talked about the book at length. [R. 46-48]. The ALJ then asked Plaintiff again if she had retirement income, health insurance, or a disability pension from the Postal Service, to which Plaintiff responded in the negative. [R. 49]. The ALJ then told Plaintiff that she should investigate those options because they could be "lucrative" because "you totaled a vehicle." [R. 50].

The ALJ next briefly asked Plaintiff if she was prescribed medication, before turning to the subject of church and asking if she had "talked to the minister," which she had. [R. 52]. The ALJ returned to the subject of *The Healing Power To Breath*, advising her that "you need to calm down and then it gets you - - I mean you've obviously got some brains and you got a nice work history and everything else, and if you could get yourself together, but you need some time." [R. 52-53]. The ALJ then ended his examination and allowed Plaintiff's attorney to ask questions. [R. 53].

Plaintiff's attorney questioned Plaintiff regarding her attempts to continue working at the Postal Service after the car accident, but Plaintiff said that she could not keep up with the changing nature of the work. [R. 54]. On two occasions, she walked off the job to check herself into a mental health institution. *Id.*

The ALJ resumed his questioning of Plaintiff, this time asking, "and you were with an abusive husband or something, right?" [R. 55]. Plaintiff responded that she had been in such a situation. The ALJ then stated:

> Okay, one of the things that - - and I understand you know, it's –this is always hard, but and I don't know if they talked to you at all about it, but there's a –because he had some problems in your [sic] childhood too with abuse and things like that, the concept of forgiveness and people talk about forgiveness and they think about forgiving a person, it's not it. You're forgiving yourself. What you're doing is you're getting in a situation where you say I don't have enough information. And I

understand that this situation wasn't very good for me and I didn't come out very well at it. But the fact of the matter is, I can't judge the other person –I don't know where they were coming from. I don't know what was in their heads. I don't know where they went afterwards and I don't know you know, it's just what you're saying is, I don't have enough information to make a judgment to myself, to anybody else or myself in that situation. And so what you say is, I'm not going to judge the situation. I'm just going to acknowledge the situation and get beyond it. The [sic] what happens is it's –this is a real quick, there's poems written about this and there's books written about it, and there's different you now counselors can do but you don't have counseling, but what I'm saying is, if you could get to a situation where he puts you back on the insurance I don't know now that he would, but maybe you could get some counseling you know and stuff like that. I don't –he probably did that for spite, cut you off [the] insurance. Just for spite and you know, that's not necessary you know, and it isn't necessary and you know it's –but how do you get beyond it. You –in your heart you've got to and then when you find the thing in your heart, it's only for you. It's only for you. Then things start going differently and you don't know why that [sic] things will go differently, but part of it is you're not bringing the past into the present and looking at situations so that you're seeing people from the past in the current situation or situations from the past or even yourself from the past in a given situation. It's a little bit more complex than that and there's ways to do it, but you need somebody but you can look into the public library at books on forgiveness and that if you can do that then these kind of situations tend to go away. They don't keep coming from the past. And you're able to look at the present in a much more objective way. You're stuck in a –between a rock and a hard place now and you've got to open up your options a little bit and if you –and I don't know exactly how to do it, but part of it is working with yourself on this. And I –but I don't know how to tell you how to do it. I don't have the time –I don't have the knowledge. I don't have the time. You're a very nice lady and you've to a very nice work history and you've got a lot of potential and I just want you to be happy and be better than this current situation. And I can see how you got where you're at. You're not in a situation where you can do much of anything. But I don't know – I – if we can give you much but we might, I don't know, let me just – we'll see, we'll see. Go ahead, counsel. I'm sorry.

[R. 55-57].

Plaintiff was then questioned again by her lawyer, who asked her about her memory problems, which she said were severe and caused by certain medications she was prescribed. [R. 57]. The ALJ asked what medications she was on, which were Gabadone, Lamictal, and Zoloft. *Id*. Plaintiff had memory and concentration problems for 70% of the day and also experienced

dizziness. [R. 58].

Next, Dr. Abbe May, the Vocational Expert ("VE"), testified. The VE described Plaintiff's past work as a letter carrier, with an SVP of 4. [R. 61]. The VE classified the exertion as medium. *Id*. The ALJ then asked the VE if a hypothetical person who was not limited exertionally, but was limited to simple, unskilled SVP 1 or 2 work, with "no high volume," could work as a letter carrier, to which the VE answered in the negative [R. 62].

The VE testified that there would be other representative jobs that a hypothetical person with the same age, education, and work experience as the Plaintiff could perform in the local, regional, or national economy. [R. 62-63]. The VE testified that the individual could perform representative light occupations such as mailroom clerk, storage facility clerk, and laundry clerk. [R. 62-63]. The ALJ discussed with Plaintiff the cost of living in Ohio and Florida, and whether she could get by on the salary from one of the jobs listed by the VE. [R. 63-66].

Plaintiff's counsel then asked the VE several questions. [R. 67]. Counsel asked the VE if a person with two or three unscheduled absences per month would be able to do any of the jobs listed above. [R. 67]. The VE stated that the hypothetical person could do none of the jobs. *Id*. Counsel then asked the VE if a person taking 4-5 breaks per day for 15 minutes would be able to do any of the jobs listed above. *Id*. The VE stated that the hypothetical person could do none of the jobs. *Id*.

B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed some of the medical evidence of record, the relevant portion of which is summarized here. Plaintiff began seeking psychiatric treatment in May 2006 with Dr. Connie Hirsh. [R. 372]. This followed an incident in

which conflicts at work caused Plaintiff's hospitalization due to depression. [R. 373]. She also reported her husband was abusive. [R. 373]. A history of four psychiatric admissions in the 1980s was noted. [R. 373]. Dr. Hirsh diagnosed major depression, recurrent, and Zoloft was continued at an increased dosage. [R. 378-79]. During a March 2010 follow up assessment with Dr. Hirsh, it was noted that Plaintiff had again recently been discharged from a psychiatric hospitalization. [R. 381].

During the course of treatment with Dr. Hirsh, Plaintiff had "lots of work issues," paranoia, and panic attacks, and was taking time off work intermittently under FMLA. [R. 381]. She was previously treated with Wellbutrin, Lithium, Pamelor, Norpramine, Cymbalta and Lexapro, with present medications of Zoloft, Wellbutrin, and Ambien. [R. 382-84]. Treatment with Dr. Hirsh continued through April 2011, at which time Plaintiff had separated from her abusive husband and was taking Risperdal, Wellbutrin, Ambien, and Zoloft. [R. 386]. In June 2011, Plaintiff used FMLA leave due to severe depression for up to eight days at a time before she could "force herself to go back to work." [R. 390]. Dr. Hirsh's diagnoses were major depressive affective disorder, recurrent, and prolonged post-traumatic stress. [R. 390].

Treatment with Dr. Hirsh continued through September 2011, with Plaintiff still managing symptoms of her past trauma. [R. 393-96]. In December 2011, Dr. Hirsh noted her depression had increased and was "severe enough that I recommended she take time off work"; however, Plaintiff reported that "makes her feel like a failure" and she was "forcing herself" to work because she "has to provide for herself." [R. 398]. In March 2012, Plaintiff reported doing well on medication; however, by May 2012 she was symptomatic again and unable to get out of bed for three days. [R. 402]. Plaintiff reported to Dr. Hirsh in June 2012 that she was improving with medication despite

dealing with her abusive husband. [R. 407]. Plaintiff continued this treatment through July 2014 with medications including BuSpar, Abilify, Sertraline, Topamax, and Lamictal. [R. 408-21].

In January 2015, Plaintiff reported she had a "nervous breakdown" in December, and on December 23 "ran her mail truck into a tree . . . [and] got a warning letter." [R. 422]. She also reported reuniting with her estranged husband, who "was verbally abusive." [R. 422]. Dr. Hirsh referred Plaintiff to a partial hospitalization program, and noted she was noncompliant with psychotherapy because it was "too painful to talk about her past abuse." [R. 424]. Dr. Hirsh diagnosed bipolar disorder, chronic, poorly controlled; and post-traumatic stress disorder, chronic, unstable. [R. 424].

From January 20 through February 6, 2015, Plaintiff received treatment in the Ohio State University Partial Hospitalization program for major depressive disorder, recurrent episode, severe, without psychotic features, with anxious distress. [R. 364]. She was admitted to the program due to worsening symptoms of depression and anxiety with recent stressors noted (separation from her husband of over 20 years since December 1, 2014). [R. 365]. She was tentatively scheduled to return to work on February 16, 2015. [R. 366]. After discharge, Dr. Hirsh noted that Plaintiff had improved and stabilized and was planning on moving to Florida to live with one of her daughters. [R. 426-27]. Dr. Hirsh explained that the bipolar diagnosis "is based on her having 2 distinct depressions, one with insomnia, irritability and agitation, racing thoughts, high anxiety and another with hypersomnia, no agitation or irritability[.]" [R. 426-27].

In May 2015, Plaintiff was still taking Lamictal and Sertraline for post-traumatic stress disorder, chronic, and bipolar disorder, chronic. [R. 428]. Plaintiff told Dr. Hirsh she quit working on March 1, and, according to Dr. Hirsh's notes, "has never recovered mentally since she went to

psych hospital after Christmas []. [H]as continued to be depressed, can't get out of bed, mood swings are severe, gets agitated, but then it just gets terrible." [R. 428]. Plaintiff told Dr. Hirsh that her estranged husband was "still doing the same mentally abusive phone calls, that put her in the hospital," and she was having passive suicidal ideation, difficulty sleeping, and what felt like panic attacks. [R. 429]. She reported rapid breathing, insomnia, anhedonia, isolation, inability to make decisions, and symptoms that "interfere with function[.]" [R. 429]. On examination, Dr. Hirsh noted decreased concentration; dysthymic, depressed, and anxious mood; and constricted and tearful affect. [R. 429]. Dr. Hirsh noted that Plaintiff had stopped her medications for four days due to constipation, and that her "depression was better when I saw her last, but quickly deteriorated when she went back to work and ex husband started making harassing and abusive phone calls to her." [R. 430]. Dr. Hirsh noted diagnoses of bipolar disorder, chronic, poorly controlled, and post-traumatic stress disorder, chronic, unstable, and instructed Plaintiff to resume her medications. [R. 430-31].

Plaintiff received treatment from psychiatrist Dr. Jared Gaines from September 10, 2015 through June 27, 2016. [R. 433-38, 450-51, 461-62, 469-71]. On her first visit, she reported "periods of time when she is extremely anxious and has had rants of her mood," but her mood swings had been responsive to Lamictal and Zoloft. [R. 450]. The mental status examination was normal; Dr. Gaines diagnosed bipolar disorder with depression; and Zoloft and Lamictal were continued. [R. 451].

In December 2015, Plaintiff reported "doing well" and that she was looking for work as a mail clerk. [R. 462]. The mental status examination was normal, and medications were continued. *Id.* In March 2016, Plaintiff told Dr. Gaines that she was still looking for work and "continuing to

do well" although she was stressed in looking for work. [R. 436]. The mental status examination was normal, and medications were continued. [R. 437]. In May 2016, Plaintiff reported increased stress as she was unable to find work, and Dr. Gaines notes that Plaintiff "has been having more perseverative anxiety and panic symptoms." [R. 433]. Abilify 5 mg and Topamax 50 mg were added to the prescription regimen, and Plaintiff declined a referral to group therapy. [R. 434]. In June 2016, Plaintiff reported she was "still depressed" and "is struggling to move forward with her life." [R. 469]. The mental status examination was normal, but Dr. Gaines increased the Abilify dosage to 10 mg and quadrupled the Topamax dosage to 200 mg. [R. 470].

Plaintiff received treatment from psychiatrist Dr. Pusey from August 2, 2016, through May 15, 2017. [R. 483-522]. On August 2, 2016, Plaintiff initiated treatment with Dr. Pusey and reported she was changing providers because Dr. Gaines recommended electroconvulsive therapy. [R. 491]. She reported severe worsening mood, poor sleep, low energy, poor appetite, anhedonia and difficulty concentrating, which Dr. Pusey noted "were affecting daily functioning." *Id*. Plaintiff also reported her ex-husband was "very emotionally abusive. She has nightmares and intrusive thoughts regarding the emotional abuse. High anxiety. Social isolation." *Id*. Dr. Pusey noted a normal mental status with a reportedly depressed mood. [R. 492]. Dr. Pusey diagnosed generalized anxiety disorder and severe recurrent major depression, and continued Lamictal (200 mg) and substituted Effexor for Zoloft. [R. 491-92].

On August 19, 2016, Plaintiff reported her depressive symptoms were still severe; she was instructed to continue transitioning from Effexor to Zoloft and Dr. Pusey noted a normal mental status with a reportedly depressed mood. [R. 509-10]. On September 21, 2016, Plaintiff reported that despite the new medication, her "depression continues to be very severe" with "occasional

fleeting passive" suicidal ideation but high indicators of suicidality clinically and upon testing. [R. 487]. Plaintiff denied having a plan, but "agreed to go to the hospital for admission assessment after the appointment." [R. 487]. Dr. Pusey also noted Plaintiff's past difficulties maintaining her work performance with symptoms, resulting in deficits in concentration and an accident. [R. 487]. Dr. Pusey noted a normal mental status with a reportedly depressed mood and prescribed a continuation of Effexor 150 mg with Topamax 50 mg. [R. 488].

Dr. Pusey also completed a Mental Assessment Form related to Plaintiff's disability claim. [R. 487, 499-501]. Dr. Pusey opined that Plaintiff's mental impairments resulted in deficiencies in concentration, depression, agitation, mood disturbance, sleep disturbance, loss of interest, and anxiety. [R. 503]. Her impairments would result in the failure to complete tasks in a timely manner, with deficiencies evident 67-100% of the day. [R. 504]. Further, Plaintiff would need to take unscheduled breaks three to four times daily. *Id.* Dr. Pusey opined Plaintiff would have good days and bad days, and if working would be absent more than four days a month. [R. 503].

On October 26, 2016, Plaintiff reported her depression was improving, although symptoms were not yet in remission, and her anxiety was stable. [R. 505]. Dr. Pusey noted a normal mental status with a reportedly depressed mood and prescribed an increased dosage of Effexor 225 mg with Topamax 50 mg and Lamictal 200 mg continued. [R. 505-06].

On January 23, 2017, Plaintiff reported "worsened depression and anxiety. Nightmares." [R. 517]. Dr. Pusey noted a normal mental status with a depressed mood. [R. 518]. Dr. Pusey increased the Lamictal dosage and recommended psychotherapy. [R. 517]. The diagnosis was changed to severe bipolar I disorder, most recent episode depressed without psychotic features, and generalized anxiety disorder. [R. 518].

On February 27, 2017, Plaintiff reported some improvement in her depression and anxiety. [R. 519]. Dr. Pusey noted a normal mental status and continued medications of Lamictal 225 mg, Effexor 225 mg, and Topamax 50 mg. *Id*. On May 15, 2017, Plaintiff reported "continued moderate levels of depression and anxiety" but had been out of Lamictal for a month; Lamictal was re-prescribed at an increased dosage of 250 mg and Xanax was added for anxiety. [R. 521]. Dr. Pusey noted a normal mental status with a depressed mood. [R. 522].

From August 28-31, 2017, Plaintiff was admitted to JFK Medical Center for inpatient treatment of major depressive disorder and required monitoring at 15 minute intervals for suicidal ideation and unpredictable behavior. [R. 524-28].

On September 1, 2017, Plaintiff was evaluated at Jerome Golden Center for admission and further inpatient treatment after her release from JFK Medical Center. [R. 534]. Upon release from JFK, she had been prescribed Lamictal 100 mg twice daily, Topamax 50 mg, and Effexor 150 mg. [R. 538]. Upon examination, Plaintiff was noted to have a tearful, depressed and overwhelmed mood; flat affect; fleeting eye contact; and was soft-spoken. [R. 534]. Plaintiff reported her activities were attending church groups twice a week. [R. 535].

On September 5, 2017, Lamictal and Effexor were continued, and Neurontin 400 mg twice daily was added. [R. 542]. On September 11, 2017, Plaintiff reported that "the abuse from ex husband was so severe that she continues to have panic episodes and PTSD [symptoms] intermittently" and that loud music was a trigger "because he played that kind of music when he was attacking her." [R. 548]. Neurontin was increased to 400 mg three times daily for anxiety, with continuation of Effexor and Lamictal. [R. 548]. Plaintiff was discharged on September 12, 2017. [R. 551].

Plaintiff returned to Jerome Golden Center on September 15, 2017, requesting readmission to inpatient psychiatric hospital, "but was educated regarding the criteria for admission there and understands now that she is not a likely candidate." [R. 553]. She was briefly re-admitted and evaluated for "stabilization of an affective decline in the context of unemployment and 'self-imposed homelessness.'" (internal quotation marks supplied) [R. 551, 553]. Plaintiff was discharged as not meeting the criteria for re-admission and inpatient treatment because "she is not gravely disabled or a danger to self/others due to mental illness at this time." [R. 551]. The discharge diagnosis was adjustment disorder with mixed anxiety and depressed mood, with medications of Neurontin 400 mg three times daily, Lamictal 100 mg, and Effexor 150 mg. [R. 551-52].

On September 16, 2017, Plaintiff was transported to Jerome Golden by police requesting voluntary admission due to a "'nervous breakdown'" with a sad and tearful mood. [R. 580]. It was noted that "in 2014, tired of 20 yrs of abuse by her husband, she decided to move to FL, & her 2 daughters and grandkids came with her. Youngest daughter with her 4 kids moved back to Ohio, and patient stayed with oldest daughter, her 2 kids and [patient's] son in a 3 bedroom apt. [Patient] states that youngest daughter moved back [into the Florida apartment] with all her kids 1 month ago and the dynamics of the household changed for the worse, 4 adults and 6 kids, that patient baby sits. [Patient] is overwhelmed" and arguing with her daughters. [R. 580]. Plaintiff was admitted and placed on suicide precautions. [R. 580]. Plaintiff was discharged on September 25, 2017, with diagnoses of adjustment disorder with mixed anxiety and depressed mood and malingering, but also with a new diagnosis of major depressive disorder, recurrent, and prescribed Gabapentin 400 mg, Lamictal 100, and Effexor 150 mg for depression/mood stabilization. [R. 581,

583].

On September 21, 2017, Plaintiff was seen for post-hospitalization follow-up. [R. 574]. She was provided with one week of medications after her September 25, 2017 discharge and "these meds have lasted her till yesterday" but Plaintiff was "[h]aving severe withdrawal from these meds" and was noted to be "tearful, depressed." [R. 574]. The medications were changed to Gabapentin 300 mg three times daily, with continued Effexor 150 mg, and Lamictal 100 mg. [R. 574]. On January 22, 2018, Plaintiff was seen for medication management. [R. 572]. Plaintiff reported "doing well" with her medications; however, it was noted that she was "tearful, depressed." [R. 572]. Medications were continued. [R. 572].

Plaintiff's treatment notes were reviewed by two state agency psychologists, Dr. David Clay (no relation) and Dr. Byron Pack. On July 10, 2016, Dr. Clay reviewed the May 27, 2016 treatment note from Dr. Gaines, and opined that Plaintiff's affective and anxiety disorders resulted in "moderate" difficulties in concentration, persistence, or pace; "mild" restriction of activities of daily living and difficulties in maintaining social functioning; and no episodes of decompensation. [R. 73-74]. Dr. Clay noted the opinion of Dr. Gaines was accorded "controlling weight." [R. 75]. Dr. Clay opined that Plaintiff could "understand, retain, and carry out simple instructions" and "perform routine tasks on a sustained basis[.]" [R. 77]. On October 17, 2016, Dr. Pack reviewed additional treatment notes from September 21, 2016, and gave the medical evidence in the record little weight." [R. 98-99]. He also reviewed Dr. Clay's treatment notes and reissued Dr. Clay's findings regarding Plaintiff's functioning. *Id.*

C.  ALJ's Decision

The ALJ issued his decision on Plaintiff's Claim for benefits on August 31, 2018. [R. 17].

The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 20-21]. The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. [R. 22]. The ALJ found at step two that "depression, anxiety, and post-traumatic stress disorder ('PTSD')" were severe impairments. *Id*. At step three the ALJ found that none of Plaintiff's impairments or combination of impairments met or equaled the criteria in Appendix 1, Subpart P of 20 C.F.R. Part 404. [R. 22]. The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels but the claimant can perform simple, unskilled (SVP 1 or 2) work without assembly line or high volume requirements." [R. 23-24]. At step four, the ALJ found that Plaintiff was unable to perform her past relevant work as a letter carrier. [R. 26]. At step five, the ALJ adopted the VE testimony and found that Plaintiff could perform a significant number of unskilled, light exertional level jobs, and as a result was not disabled and was not under a disability, as defined by the SSA, from the alleged onset date through the date last insured. *Id.*

## II.   <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In her Motion for Summary Judgment, Plaintiff argues that (1) the findings of fact should have resulted in Plaintiff's being found disabled by direct application of the Grids, (2) the ALJ's evaluation of the medical opinion evidence was flawed, and (3) the ALJ's rationale for rejecting Plaintiff's allegations was unsupported by substantial evidence. [DE 25]. In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law [DE 19], he asserts that substantial evidence supports the ALJ's decision and the ALJ applied the correct legal standards.

## III.   <u>LEGAL ANALYSIS</u>

Judicial review of the factual findings in disability cases is limited to determining whether

the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

16

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's residual functioning capacity, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

A. Whether the ALJ Erred in Deciding that Plaintiff was Not Disabled by Direct Application of the Medical-Vocational Guidelines (the Grids) as of January 28, 2016.

Plaintiff argues Dr. May, the VE, testified that *only* light exertional jobs were available for the Plaintiff's limitations. Because of this, Plaintiff argues that 20 C.F.R. § 404, Subpart P, Appendix 2, Rule 202.06, requires a direct application of the Medical Vocational Guidelines ("the Grids"). Applying the Grids, since Plaintiff was of the appropriate age, with a high school education and skills that were no longer transferable, Plaintiff contends that she should have been

deemed disabled. Defendant argues that a direct application of the Grids is improper because the ALJ did not find that Plaintiff had any exertional limitations but rather that Plaintiff solely had non-exertional limitations. Thus, a direct application of the Grids and Rule 202.06 would be incorrect. Instead, Defendant argues, the correct method would be considering the framework of Grid Rule section 204.00.

After a careful review of the record, the Court finds that a direct application of the Grids Rule 202.06 would be improper and therefore rejects Plaintiff's first argument. The general rule is that once the claimant's RFC and ability or inability to return to past relevant work is determined, an ALJ may then use the Grids "to determine whether other jobs exist in the national economy that a claimant is able to perform." *Phillips*, 357 F. 3d at 1242. "However, '[e]xclusive reliance on the grids is not appropriate . . . when a claimant has non-exertional impairments that significantly limit basic work skills.'" *Id.* (quoting *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)); *see also McFadden v. Astrue*, No. 5:08–cv–144, 2009 WL 3158183, at *2 (M.D. Fla. Sept. 28, 2009) ("[T]he ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment . . . ."). If "the ALJ determines that nonexertional limitations significantly limit her basic work skills at the sedentary work level, then the ALJ must consult a vocational expert." *Phillips*, 357 F. 3d at 1243.

The ALJ asked the VE whether an individual with no exertional limitations but limited to simple, unskilled, and no high volume work could return to Plaintiff's past work. [R. 62]. The VE answered the question in the negative. *Id.* After this, without encouragement from the ALJ, the VE gave examples of jobs available in the national economy for unskilled work that is not in a high pressurized environment. [R. 62-63]. At no point did the ALJ ask the VE to provide jobs that are

*only* at the light exertional level. In fact, after the VE testified that multiple jobs would be available in the national economy, consisting of a mailroom clerk, storage facility clerk, and laundry sorter, the ALJ told the VE that he did not need more examples. [R. 63]. This does not mean, as Plaintiff suggests, that the ALJ adopted the VE testimony that *only* light exertional jobs were available for the limitations given. The ALJ is not required to identify jobs at each exertional level that Plaintiff could perform. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) ("If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work."). Moreover, Plaintiff has not argued that any exertional limitations exist, limiting Plaintiff's ability to only light exertional work.

Thus, the record reveals that the ALJ followed the appropriate procedure in this regard and correctly determined that a direct application of Grids Rule 202.06 would have been improper. The Court rejects Plaintiff's argument to the contrary.

B. Whether Substantial Evidence Supports the ALJ's Evaluation of the Medical Opinion Evidence.

Plaintiff highlights several aspects of the ALJ's analysis of the medical opinion evidence that she submits are flawed. First, she argues that the ALJ erred in failing to weigh or mention the opinion of treating psychiatrist, Dr. Hirsh. Second, Plaintiff argues that the rationales provided by the ALJ for the opinions that were weighed lacked good cause, were not supported by substantial evidence, failed to comply with governing regulations, and resulted in harmful error. Third, Plaintiff highlights several bizarre or improper statements made by the ALJ that indicate that he impermissibly substituted his lay opinion for the medical evidence of the record, and believed that he could cure her. Upon careful review, the Court finds that the ALJ's evaluation of the record evidence was flawed and unsupported by substantial evidence, and thus finds that remand is

19

appropriate for several reasons, discussed below.

> 1. Whether the ALJ erred in failing to weigh or mention the opinion of Plaintiff's treating psychiatrist, Dr. Hirsh.

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 F. App'x. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440. "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*[3]

The ALJ did not specify the weight or state that any weight was given to medical source opinion of Plaintiff's treating psychiatrist, Dr. Hirsh. Plaintiff argues remand is required for proper consideration of the treating psychiatrist's opinion. While Defendant admits that the ALJ failed to address or give weight to Dr. Hirsh's medical source opinion, Defendant argues the error is harmless because Dr. Hirsh's statement is not a medical opinion and the ALJ does not have to refer to every piece of evidence in the record. The Court finds that the ALJ did err in this regard, and

---

[3] The Court notes that the law on the deference to give treating physicians has changed, but only for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. Here, Plaintiff's claim was filed prior to March 27, 2017.

that the error is not harmless.

The Court agrees with Plaintiff that the ALJ's failure to mention what weight he gave to Dr. Hirsh's medical opinion constitutes reversible error, as good cause did not support discounting this opinion. Dr. Hirsh was Plaintiff's treating psychiatrist from May 2006 to May 2015. At issue is Dr. Hirsh's medical opinion on May 20, 2015, which was not evaluated or mentioned in the ALJ's decision. In this medical opinion, Dr. Hirsh states the following:

> Increase in depression again, off meds for 4 days . . . . [D]epression was better when I saw her last, but quickly deteriorated when she went back to work and ex husband started making harassing and abusive phone calls to her. . . . As far as being disabled, she certainly can't work now and is completely disabled and if she had come back to me sooner, I would have put her off work, rather than have her quit. She's not been well for 5 months, and before that, although was working, was struggling to do day to day tasks, most PTSD symptoms including huge avoidance of psychotherapy. As far as being disabled long term, her functioning has always been marginal and it wouldn't surprise me if she has reached a tipping point and may not be able to return to work, and need SSD, but [I] think she needs to be reassessed once she gets to Florida

> . . . .

> She can apply for SSD, since she is disabled, and there is a good chance with everything that's happened, that she might not be able to return to work, but it's too soon to know whether her disability will last more than a year or be long term. But after wrecking the mail truck at work, her anxiety about returning to work is quite high, and she will need to establish [a] treatment team and go to therapy in Florida, which she's been very reluctant to do, to make enough progress to get her back to employment. Even then, not sure she can do it.

[R. 430-31].

Defendant argues that Dr. Hirsh's opinion that Plaintiff was not able to work and was disabled is not a medical opinion but is instead an opinion on an issue reserved to the Commissioner because it would direct the determination or decision of disability. Defendant is correct on this statement of law, but fails to fully appreciate the entire contents of Dr. Hirsh's

opinion. To that end, there are numerous other statements within the medical opinion that do not reference any matter reserved for the Commissioner, such as Plaintiff being disabled as defined the Social Security Act. For example, "[s]he's not been well for 5 months, and before that, although was working, was struggling to do day to day tasks, most PTSD symptoms including huge avoidance of psychotherapy," is not a statement concerning Plaintiff being disabled nor does it concern her inability to return to work. It simply offers a medical opinion of Plaintiff's current state and affect. Therefore, the remainder, and majority, of Dr. Hirsh's medical opinion should have properly been evaluated and considered, with the appropriate amount of weight, as a medical opinion issued by the treating physician.

Defendant attempts to cast a blanket of protection over the entire medical opinion of Dr. Hirsh in an effort to make the ALJ's failure to evaluate or mention it as harmless. Moreover, Defendant does not argue that good cause exists to reject Dr. Hirsh's opinion: Defendant never stated (1) that Dr. Hirsh's opinion was not bolstered by the evidence, (2) that the evidence supported a contrary finding, or (3) that the opinion was conclusory or inconsistent with the doctor's own medical records. *See Phillips*, 357 F.3d at 1241. Rather, Defendant argues the ALJ's failure to consider Dr. Hirsh's statement can be deemed harmless if other evidence that the ALJ did consider in his opinion establishes good cause for discounting Dr. Hirsh's opinion.

The case Defendant cites, *Chapman v. Commissioner*, is distinguishable from the facts at hand, and does not bear on whether good cause existed in this case. 709 F. App'x 992 (11th Cir. 2017). In *Chapman*, the court found the ALJ's error to be harmless only when the treating physician's opinion that Plaintiff was "permanently disabled" was not supported by the treating physician's own medical findings, in addition to the fact that Plaintiff refused treatment options

for her condition. *Id.* at 995. But this constituted good cause. *See Phillips*, 357 F.3d at 1241. Since

the ALJ had good cause, he "was entitled to discount [the treating physician's] conclusory

statement to the contrary." *Id.* Thus, the case is not persuasive, and Defendant has failed to

establish that good cause exists for not giving substantial or considerable weight to the medical

opinion of Dr. Hirsh. Accordingly, the ALJ erred in failing to properly weigh the medical opinion

of treating psychiatrist, Dr. Hirsh.

> 2. Whether rationales provided by the ALJ for the opinions that were weighed lacked good cause, were not supported by substantial evidence, failed to comply with governing regulations, and resulted in harmful error.

Upon close inspection of all of the relevant medical evidence of record, including that

submitted by Dr. Pusey and the state agency physicians, which were considered by the ALJ, the

Court finds that all of these medical opinions appear to support Plaintiff's claim of disability. The

Court finds that the ALJ failed to rely on substantial evidence in finding that Plaintiff was not

disabled. For example, the ALJ rejected Dr. Pusey's ultimate conclusion that Plaintiff would not

be able to function in the workplace because it contained "mental status examinations [showing]

normal eye contact, normal memory, and normal attention and concentration" and "the claimant's

self-reported improvement on medication." [R. 26]. However, the Court finds that the ALJ seems

to have cherry-picked one of the only pieces of medical evidence from Dr. Pusey's entire opinion

and treatment notes which arguably supported the ALJ's decision, and ignored the rest, most of

which support a finding of disability. To that end, the ALJ failed to acknowledge the fact Plaintiff

suffered a "nervous breakdown" despite medication and sought readmission to the hospital a few

weeks *after* she made the statement that she was feeling better with medication. [R. 576]. More

broadly, Dr. Pusey noted Plaintiff's depression had increased and was "severe enough that I

recommended she take time off work" because she was "forcing herself" to work because she "has to provide for herself." [R. 398]. Based on the forgoing, the ALJ's reasons for discrediting Dr. Pusey's opinion are not supported by substantial evidence. When read in the whole, Dr. Pusey's opinions appear to support a finding of disability.

Further, the ALJ erred in according "some weight" to the opinion of non-examining state agency psychologists Drs. Clay and Pack while ignoring the treating physicians. When the opinion of an examining physician is compared with an opinion of a non-examining physician, "[t]he opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician." *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *see also Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (noting that the opinion of a non-examining physician "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision").

In this case, the ALJ erred in relying on the state agency psychologists over the opinions of Dr. Pusey, and without mention, Dr. Hirsh. The opinions of non-examining sources Drs. Clay and Pack were based on an incomplete record – containing only two treatment notes from May and September 2016. Dr. Clay reviewed no treatment notes from Dr. Pusey. While Dr. Pack at least mentioned Dr. Pusey's treatment note, his brief summary of the September 21, 2016 note does not indicate that he was aware of Plaintiff's critical issues; specifically, Dr. Pusey found that Plaintiff had high indicators of suicidality clinically, and, upon testing, convinced Plaintiff "to go to the hospital for admission assessment after the appointment." [R. 487]. Accordingly, the medical opinions of these non-examining state agency psychologists did not constitute substantial evidence on which the ALJ could rely in making his finding that Plaintiff was not disabled.

### 3. Whether the ALJ erred by substituting his lay opinion for that of a medical or mental health professional.

Plaintiff also argues that the ALJ erred by improperly substituting his lay opinion for the opinions of mental health professionals, as evinced by a series of statements he made at the administrative hearing. The Court agrees, notes the many bizarre and improper statements made by the ALJ at the hearing, and finds that this error constitutes an additional basis on which to find that the ALJ's decision was not supported by substantial evidence.[4]

"The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). "An ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of medical professionals." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring). *See also Freeman v.*

---

[4] The statements, many of them bizarre or improper, made by ALJ Armstrong at the hearing causes this Court to seriously doubt the legitimacy and soundness of the ALJ's Decision. The Court notes that this is apparently not the first time ALJ Armstrong has made inappropriate or bizarre comments at an administrative hearing regarding a social security disability claim. *See e.g.*, *Nepa v. Comm'r of Soc. Sec.*, No. 12-CV-13362, 2013 WL 4670435, at *9 (E.D. Mich. Aug. 30, 2013) ("[T]he ALJ's colloquy when taken as a whole was not appropriate. This is particularly true . . . when the claimant stated that she was in excruciating pain and the ALJ responded by telling her that she was a relatively attractive, not necessarily unintelligent young woman who should decide what she wants to do with her life and simply go do it. The ALJ's . . . implication that Plaintiff should simply 'get over' the alleged abuses in her past because she now has a good husband were also not appropriate in the context of an impartial disability determination. Viewing the ALJ's comments within the framework of the disability determination, in which he . . . appeared to gloss over her psychiatric hospitalizations, and gave no discussion to treating mental health opinions that indicate that Plaintiff has serious impairments, the undersigned suggests that the ALJ has shown himself to be biased toward Plaintiff and incapable of rendering an impartial decision on remand."); *Bergschwenger v. Comm'r of Soc. Sec.*, No. 11–11752, 2012 WL 4009916, at *16 (E.D. Mich. Aug. 20, 2012) ("[R]eferring to plaintiff, who is apparently Jewish, as a 'you know' and discussing a random book purportedly written by an 'atheistic Jewish lady' hardly seems within the realm of appropriate questioning during an administrative hearing regarding a social security disability claim. In light of the numerous instances described above . . . it is entirely clear that the ALJ's credibility analysis was tainted and biased."); *see also Hatchett v. Astrue*, No. 10 CV 2133, 2011 WL 3876920, at *13–14 (N.D. Ill. Aug. 31, 2011) (noting ALJ Armstrong did not exhibit bias worthy of remand to a new ALJ, but that "some of the ALJ's comments regarding the ripeness of the case were unnecessary and his expressions of frustration may have upset claimant to the point of her leaving the hearing").

*Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982) (per curiam) (finding that "the ALJ improperly substituted his judgment of the claimant's condition for that of the medical and vocational experts"); *Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11th Cir. 1986) (per curiam) ("Here, . . . the ALJ has rejected the opinions of the treating physician not even on the basis of a differing opinion expressed by another doctor, but rather because ALJ himself reached a different conclusion after viewing the medical records. Such circumstantial evidence cannot alone support a finding of a nonsevere disability in the face of an opposing conclusion by the treating physician."); *Morales,* 225 F.3d at 317 ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.").

In this case, the Court finds that the ALJ impermissibly discounted the medical evidence indicating that Plaintiff was disabled and instead offered bizarre suggestions which, he seemed to believe, would cure her. The ALJ appears to have improperly taken on the role of a therapist or mental health professional at the hearing. After Plaintiff explained that "there are days I just cannot get out of bed and there are such dark days . . . ", the ALJ provided recommendations to Plaintiff that she go to the ocean, go to nature trails, and do breathing exercises. [R. 45-46]. The ALJ then recommended that Plaintiff read a self-help book:

> I mean there's a book out. [] I've got it. I read it. In my pile of stuff here. Healing Power to Breath [sic] by this guy Brown and Gardberg and it's a good thing, again it's probably more for anxiety than depression. But something tells me that one of the biggest things is all this people [sic] and everything, you need a little bit of time to calm down and then if you can learn those breathing techniques it's a lot easier to deal with stressful situations. And if you can get something you know coming in, you know, even part-time stuff you can probably get yourself a place or something like that. I don't know, you moved in with your kids figuring it was

going to be less stressful getting away from your job I bet. That's what you thought and it didn't turn out to be that way in the end . . . .

. . . .

So the only way to get it [silence, solitude] right now is to like they said go out. You need to go out and get away. I understand you're expected to somehow with the kids and stuff, but there's times [sic] if you start getting yourself into a routine of getting that silence in nature or something else, I bet that's going to help a little bit. This book, the Healing Power to Breath is a good start to – but you don't need it [sic]. You don't need this book. I mean they tell you that all you got to do is slow down your breath . . . you got to get yourself together in order to get into a better situation. You know and but the problem is you can't check into these places. They'll let you do it once a – you don't have insurance either, right?

[R. 46-47]. The ALJ again recommended the same book, noting "it would be a good start" and the authors "actually got a clinic that they work with" and telling Plaintiff she could purchase the book or ask her church to purchase the book for her. [R. 53]. The ALJ continued, "you need to calm down and then it gets you – I mean you obviously got some brains and a nice work history and everything else, and if you could get yourself together, but you need some time. You did very well when you were over at Golden Center, but that's not where you're at. You don't – you can't go in there all the time and relax and stuff. So you've got to carve out some time for yourself every day to get yourself breathing and together and stuff like that, and then – okay." [R. 53].

The ALJ also suggested Plaintiff obtain work at a second-hand store run by her church, assuming such a store existed, and stated "you get out of the house, plus there's people to talk to, so you can get a little bit of socialization. I mean, you got to try something." [R. 60]. The ALJ appeared to improperly take on the role of a therapist and mental health professional at the hearing instead of fulfilling his duties to properly evaluate the medical and mental health opinions and evidence.

27

Plaintiff has spent decades in outpatient and inpatient treatment with psychiatrists and psychologists, all of whom have diagnosed her with serious mental illness and have recognized the devastating trauma that may have caused these ailments. When the ALJ ignored (Dr. Hirsh) or disregarded (Dr. Pusey) the medical evidence, and instead attempted to tell Plaintiff how she could improve on her own, the ALJ impermissibly put himself in the shoes of a medical professional, which constitutes reversible error. *See Cooke v. Colvin*, 2016 WL 110510, at *9 (S.D. Ala. Jan. 8, 2016).

The Court notes that the ALJ's suggestion that Plaintiff's disability would resolve itself if, for example, she simply reads a book on breathing, evinces a disturbing failure on the part of this ALJ to grasp the nature and seriousness of mental illnesses in general. Furthermore, it was not just one moment where the ALJ told Plaintiff that she could get better with a book, or by "nature trails" or "decent weather." [R. 45-46]. The ALJ's mind appears to have been made up—no matter what Plaintiff said, or what the medical evidence established, the ALJ had an answer for how she could overcome her current mental illness. *See* [R. 48] ("Q: Say you had a job that was quiet. . . . [D]o you think you could do that job? A: Physically, sir, mentally no. Q: Well it might be quieter than it is at home you know what I'm saying? I mean it might be—I'm just saying, if you got a job it'd be an excuse for getting out of the house."). While the ALJ is in charge of making a determination of disability, the ALJ does not have a medical degree nor is he a qualified therapist or mental health professional. However, in this case, the ALJ nonetheless substituted his lay person opinion for that of the trained medical and mental health professionals.

But unfortunately, the ALJ's improper statements went far beyond stepping into the shoes of a medical or mental health professional. The Court notes and highlights additional improper

28

statements made by the ALJ which clearly derailed the August 21, 2018 hearing to the extent that the Court questions the very legitimacy of the hearing and the resulting Decision.

The record reflects that Plaintiff lacks insurance because her abusive and estranged ex-husband ended the coverage. [R. 47, 52]. In response to this, the ALJ suggested forgiving him in order to get back on his insurance:

> I understand you know, it's – this is always hard, but and I don't know if they talked to you at all about it, but there's a – because he had some problems in your [sic] childhood too with abuse and things like that, the concept of forgiveness and people talk about forgiveness and they think about forgiving a person, it's not it. You're forgiving yourself. What you're doing is you're getting in a situation where you say I don't have enough information. And I understand that this situation wasn't very good for me and I didn't come out very well at it. But the fact of the matter is, I can't judge the other person – I don't know where they were coming from. I don't know what was in their heads. I don't know where they went afterwards and I don't know you know, it's just what you're saying is, I don't have enough information to make a judgment to myself, to anybody else or myself in that situation. And so what you say is, I'm not going to judge the situation. I'm just going to acknowledge the situation and get beyond it. The [sic] what happens is it's – this is a real quick, there's poems written about this and there's books written about it, and there's different you now counselors can do but you don't have counseling, but what I'm saying is, if you could get to a situation where he puts you back on the insurance I don't know now that he would, but maybe you could get some counseling you know and stuff like that. I don't – he probably did that for spite, cut you off [the] insurance.
>
> Just for spite and you know, that's not necessary you know, and it isn't necessary and you know it's – but how do you get beyond it. You – in your heart you've got to – and then when you find the thing in your heart, it's only for you. It's only for you. Then things start going differently and you don't know why that [sic] things will go differently, but part of it is you're not bringing the past into the present and looking at situations so that you're seeing people from the past in the current situation or situations from the past or even yourself from the past in a given situation.
>
> It's a little bit more complex than that and there's ways to do it, but you need somebody but you can look into the public library at books on forgiveness and that if you can do that then these kind of situations tend to go away. They don't keep coming from the past. And you're able to look at the present in a much more objective way. You're stuck in a – between a rock and a hard place now and you've

> got to open up your options a little bit and if you – and I don't know exactly how
> to do it, but part of it is working with yourself on this. And I – but I don't know
> how to tell you how to do it. I don't have the time – I don't have the knowledge. I
> don't have the time. You're a very nice lady and you've to a very nice work history
> and you've got a lot of potential and I just want you to be happy and be better than
> this current situation . . . .

[R. 55-56]. The ALJ's suggestion to Plaintiff, a survivor of domestic abuse, that she forgive her abusive ex-husband in order to get back on his insurance, is potentially deadly advice that greatly concerns the Court. There is no place for such a comment from an ALJ. No competent therapist or mental health professional would provide such disconcerting advice. Moreover, the ALJ has no business providing Plaintiff with advice about forgiving an abusive ex-husband.

Plaintiff has a traumatic history of abuse. Plaintiff experienced abuse from "as far back as she [can] remember" until Plaintiff reached the age of thirteen. [R. 381] ("[The abuse] was so bad in her household. [W]as an everyday occurrence."). Plaintiff then married at the young age of sixteen, experiencing more abuse, which eventually led to a suicide attempt. *Id.* After divorcing her first husband, Plaintiff remarried and experienced physical abuse in her second marriage. *See id.* The Court finds it quite disturbing that the ALJ, having known all of this information, and presiding over a hearing in which Plaintiff appeared before him to seek benefits, instructed Plaintiff to forgive her abusers when the ALJ is unqualified to offer such advice and when such advice has no place in a Social Security hearing. This type of commentary could serve to stigmatize people suffering mental health issues and abuse and could discourage people from seeking treatment or help when needed. The effort by the ALJ to brush off Plaintiff's past trauma by telling her to "acknowledge it and get beyond it," is simply unacceptable. [R. 56].

Lastly, the Court notes the ALJ's curious and quite surprising choice of verbiage at the hearing when speaking to an African American Claimant. [R. 364]. In this regard, the ALJ stated

that a minimum wage job would "be better than what you'd be making off of disability I'll tell you that right now. Not that I – that our system is **niggardly** it's not that way. It's just, it's based on a retirement." (emphasis added) [R. 65]. The Court frankly cannot understand why the ALJ would even consider using such language or make such a comment at the hearing.

Suffice it to say that many of the comments made by the ALJ at the hearing, as specified above, were bizarre, improper, and inappropriate. It appears to this Court that the ALJ decided this case not on proper factors such as the proper evaluation of the opinions of the mental health experts and medical records, but rather on extraneous and irrelevant factors. Had the ALJ properly performed his duties and discussed and assigned the weight he gave to Dr. Hirsh's opinions, for example, instead of offering breathing exercises, therapy and mental health treatment—and suggesting that Plaintiff reconcile with her abusive ex-husband to get on his insurance—the result here might be different. But unfortunately, the ALJ took the hearing on an improper and tangential course that is inappropriate for such a hearing.

These errors were not harmless. At step four, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels but that Plaintiff "can perform simple, unskilled (SVP 1 or 2) work without assembly line or high volume requirements." [R. 23-24]. And, because the ALJ found that the Plaintiff cannot perform her past relevant work, a *prima facie* case of disability was established. 20 C.F.R. § 404.1520(e). Thus, at step five, the burden was on the ALJ to show that despite Plaintiff's impairments, she was able to perform work in the national economy in light of her RFC, age, education and work experience. However, for all of the reasons previously stated, the ALJ failed to meet his burden to show that, despite the Plaintiff's

impairments, she was able to perform work in the national economy in light of her RFC, age education and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239.

Accordingly, for all the reasons stated above, the Court finds that the ALJ's evaluation of the medical opinion evidence was not supported by substantial evidence, constitutes reversible error, and requires remand. Not only did the ALJ fail to properly weigh the opinion of Plaintiff's treating psychiatrist, Dr. Hirsh, but the ALJ singled out certain statements from Dr. Pusey's medical evidence in order to support his finding, rather than weigh the evidence as a whole. Furthermore, the ALJ's statements to Plaintiff at the hearing were bizarre and improper. The ALJ put himself in the shoes of a mental health professional, describing methods Plaintiff could use to help dispel her mental health issues, and substituted his lay person opinion for that of medical professionals. Thus, all of these errors by the ALJ, independently, and considered jointly, warrant remand.

C. Whether the ALJ Displayed Bias Warranting Remand at the August 21, 2018 Hearing.

Plaintiff argues that the ALJ improperly displayed bias against her at the August 21, 2018 hearing, and that this warrants remand. Defendant argues that Plaintiff waived this argument.

Social Security regulations dictate that "[a]n administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." 20 C.F.R. §§ 404.940, 416.1440. A presumption of honesty and integrity exists in those who serve as adjudicators for administrative agencies. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The burden of overcoming this presumption rests on the party making the assertion of bias. *See McClure*, 456 U.S. at 196.

32

After carefully evaluating this issue, the Court is required to find that Plaintiff waived her claim of bias. *See* 20 C.F.R. §§ 404.940, 416.1440 (noting that if a plaintiff objects to the ALJ who is conducting the hearing, she must notify the ALJ at the earliest opportunity, so that the ALJ can decide whether to proceed with the hearing or withdraw).

Plaintiff, who was represented by counsel at the hearing, did not object to the ALJ's statements at the hearing. Because Plaintiff failed to object, her claim of bias is waived. *See Stokes v. Astrue*, 2009 WL 2216785, at *14 (M.D. Fla. Jul. 23, 2009) (concluding that "[s]ince a review of the hearing transcript discloses a failure to object in the requisite manner, 'the Court is precluded from reviewing the issue of the ALJ's bias.'") (citation omitted). In light of the applicable regulation and case law, the Court declines to address the issue of the ALJ's bias as it has been waived by Plaintiff pursuant to the authorities discussed above.

### IV.    <u>CONCLUSION</u>

The Court finds that the record does not contain substantial evidence to support the denial of benefits to Plaintiff. The Court also finds that the ALJ failed to provide sufficient reasoning for his decision to deny Plaintiff benefits. Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion**.** On remand, the Commissioner should schedule a new hearing, reassess the entire record and reconsider and weigh all available medical and mental health records and opinions. The Court expresses no opinion as to what decision the Commissioner should ultimately reach on Plaintiff's claim on remand.

2.  In light of the comments made by ALJ Paul Armstrong at the prior hearing, as well as Plaintiff's claim of bias lodged on appeal before this Court, the Commissioner should carefully consider re-assigning this case, on remand, to a different ALJ.

3.  Accordingly, Plaintiff's Motion for Summary Judgment [DE 25] is hereby **GRANTED**, and Defendant's Motion for Summary Judgment [DE 32] is hereby **DENIED**.

4.  Judgment will be entered separately.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of March 2021.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE